[No. E046318. Fourth Dist., Div. Two. May 26, 2010.]

STEVEN BEUTZ, Plaintiff and Appellant, v.
COUNTY OF RIVERSIDE, Defendant and Respondent.

1518

COUNSEL

Steven Beutz, in pro. per.; Gangloff, Gangloff & Pool and Robert A. Pool for Plaintiff and Appellant.

Colantuono & Levin, Michael G. Colantuono, Sandra J. Levin and Erwin M. Benedicto for Defendant and Respondent.

OPINION

KING, J.—

## I.  INTRODUCTION

In 2006, the County of Riverside (the County) formed a special assessment district consisting of all residential properties in the community of Wildomar in order to pay the annual ongoing costs of refurbishing and maintaining landscaping in four public parks in the community.[1] Plaintiff Steven Beutz, an owner of residential property in Wildomar, filed suit against the County to void the landscape assessment on the ground it violated article XIII D of the California Constitution[2] (art. XIII D, § 4, subd. (a)), which was enacted following voters' adoption of Proposition 218 in 1996. Beutz claimed the County failed to separate the general benefits from the special benefits of the landscaping, and to assess only for the special benefits the landscaping would confer on assessed parcels. Following the parties' cross-motions for summary judgment, the trial court entered judgment in favor of the County, and Beutz appeals.

We conclude the County properly based the assessment on the larger public improvement project of which the landscaping costs were a part, namely, a master plan to acquire and develop the parks and park facilities, rather than on the landscape portion of the plan. Still, the County failed to meet its constitutional burden of demonstrating that the assessment was proportional to, and did not exceed, the value of the special benefits that the use and enjoyment of the parks would confer on assessed parcels. (Art. XIII D, § 4, subds. (a), (f).) For this reason, the assessment is invalid and the judgment must be reversed.

[1] The formerly unincorporated community of Wildomar was incorporated and became a city following the November 2008 election.

[2] All further references to articles are to the California Constitution.

## II. OVERVIEW OF PROPOSITION 218 AND ARTICLE XIII D

### A. *The Genesis of Proposition 218*

In 1996, California voters adopted Proposition 218, known as the Right to Vote on Taxes Act, which added articles XIII C and XIII D to the California Constitution. (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 835–837 [102 Cal.Rptr.2d 719, 14 P.3d 930].) In *Howard Jarvis Taxpayers Assn. v. City of Riverside* (1999) 73 Cal.App.4th 679 [86 Cal.Rptr.2d 592] (Fourth Dist., Div. Two), this court explained the genesis of Proposition 218:

"Proposition 218 can best be understood against its historical background, which begins in 1978 with the adoption of Proposition 13. 'The purpose of Proposition 13 was to cut local property taxes. [Citation.]' [Citation.] Its principal provisions limited ad valorem property taxes to 1 percent of a property's assessed valuation and limited increases in the assessed valuation to 2 percent per year unless and until the property changed hands. (Cal. Const., art. XIII A, §§ 1, 2.)

"To prevent local governments from subverting its limitations, Proposition 13 also prohibited counties, cities, and special districts from enacting any special tax without a two-thirds vote of the electorate. (Cal. Const., art. XIII A, § 4; [citation].) It has been held, however, that a special assessment is not a special tax within the meaning of Proposition 13. [Citation.] Accordingly, a special assessment could be imposed without a two-thirds vote.

"In November 1996, in part to change this rule, the electorate adopted Proposition 218 . . . . Proposition 218 allows only four types of local property taxes: (1) an ad valorem property tax; (2) a special tax; (3) an assessment; and (4) a fee or charge. (Cal. Const., art. XIII D, § 3, subd. (a)(1)–(4); see also Cal. Const., art. XIII D, § 2, subd. (a).) It buttresses Proposition 13's limitations on ad valorem property taxes and special taxes by placing analogous restrictions on assessments, fees, and charges." (*Howard Jarvis Taxpayers Assn. v. City of Riverside, supra,* 73 Cal.App.4th at pp. 681–682; see *Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles, supra,* 24 Cal.4th at pp. 835–842 [discussing the origins of Prop. 218 and its intent to limit a local government's ability to impose taxes, assessments, and fees on real property owners].)

### B. *Special Assessments and Article XIII D*

The state Supreme Court explained the nature and distinguishing features of a special assessment in *Knox v. City of Orland* (1992) 4 Cal.4th 132 [14

Cal.Rptr.2d 159, 841 P.2d 144] (*Knox*), a pre-Proposition 218 case: "A special assessment is a ' " 'compulsory charge placed by the state upon real property within a pre-determined district, made under express legislative authority for defraying in whole or in part the expense of a permanent public improvement therein . . . .' " [Citation.]' [Citation.] In this regard, a special assessment is 'levied against real property particularly and directly benefited by a local improvement in order to pay the cost of that improvement.' [Citation.] 'The rationale of [a] special assessment is that the assessed property has received a special benefit over and above that received by the general public. The general public should not be required to pay for special benefits for the few, and the few specially benefited should not be subsidized by the general public. [Citation.]' [Citation.]" (*Knox, supra*, at pp. 141–142.)

The court also explained that a special assessment differs from a tax or a "special tax" in at least one important respect. Unlike a special assessment, a tax may be imposed " ' "without reference to peculiar benefits to particular individuals or property," ' " or without regard to whether the person or property subject to the tax received any particular benefit from the tax. (*Knox, supra*, 4 Cal.4th at p. 142.) "The same holds true even for a special tax which . . . is a tax levied to fund a specific governmental project or program [citations]," but which " 'need not . . . specifically benefit the taxed property' in the same manner as a special assessment." (*Ibid.*) "Therefore, while a special assessment may, like a special tax, be viewed in a sense as having been levied for a specific purpose, a critical distinction between the two public financing mechanisms is that a special assessment must confer a special benefit upon the property assessed beyond that conferred generally." (*Ibid.*, fn. omitted.)

Article XIII D imposes both procedural and substantive limitations on an agency's ability to impose a special assessment. (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 437–438, 443 [79 Cal.Rptr.3d 312, 187 P.3d 37] (*Silicon Valley*).) The substantive limitations are twofold: (1) an assessment can be imposed only for a "special benefit" conferred on the real property assessed, and (2) the assessment must be in proportion to, and not greater than, the special benefit conferred on the property assessed. (Art. XIII D, § 4, subd. (a); *Silicon Valley, supra*, at p. 443.)

The special benefit and proportionality requirements of article XIII D are set forth in section 4, subdivision (a): "An agency which proposes to levy an assessment shall identify all parcels which will have a special benefit conferred upon them and upon which an assessment will be imposed. The proportionate special benefit derived by each identified parcel shall be determined in relationship to the entirety of the capital cost of a public

improvement, the maintenance and operation expenses of a public improvement, or the cost of the property related service being provided. No assessment shall be imposed on any parcel which exceeds the reasonable cost of the proportional special benefit conferred on that parcel. Only special benefits are assessable, and an agency shall separate the general benefits from the special benefits conferred on a parcel. . . ."

Article XIII D defines "District" as "an area determined by an agency to contain all parcels which will receive a special benefit from a proposed public improvement or property-related service." (Art. XIII D, § 2, subd. (d).) " 'Assessment' means any levy or charge upon real property by an agency for a special benefit conferred upon the real property." (*Id.*, subd. (b).) A "special benefit" is narrowly defined as "a particular and distinct benefit over and above general benefits conferred on real property located in the district or to the public at large." (*Id.*, subd. (i).) Correspondingly, the definition of special benefit further states: "General enhancement of property value does not constitute 'special benefit.' " (*Ibid.*; see *Silicon Valley, supra*, 44 Cal.4th at p. 451.)

Thus, Proposition 218 tightened the definition of special benefit and broadened the definition of general benefit—without affirmatively defining "general benefit." (*Silicon Valley, supra*, 44 Cal.4th at pp. 451–452.) General benefits include "benefits conferred generally 'on real property located in the district' " (*id.* at p. 451, fn. omitted), while "a special benefit must affect the assessed property in a way that is particular and distinct from its effect on other parcels and that real property in general and the public at large do not share" (*id.* at p. 452, fn. omitted).

The requirement that the agency "separate the general benefits from the special benefits conferred on a parcel" (art. XIII D, § 4, subd. (a)) helps ensure that the special benefit requirement is met. "Because only special benefits are assessable, and public improvements often provide both general benefits to the community and special benefits to a particular property, the assessing agency must first 'separate the general benefits from the special benefits conferred on a parcel' and impose the assessment only for the special benefits." (*Silicon Valley, supra*, 44 Cal.4th at p. 443.)

The special benefit and proportionality requirements are perhaps best understood as being interrelated, not separate, requirements. The proportionality requirement ensures that the *aggregate* assessment imposed on *all* parcels is distributed *among* all assessed parcels in *proportion* to the special benefits conferred on *each parcel*. (See *Town of Tiburon v. Bonander* (2009) 180 Cal.App.4th 1057, 1080–1085 [103 Cal.Rptr.3d 485] (*Tiburon*) [varying amounts assessed on district parcels for the costs of undergrounding utility

lines violated the proportionality requirement because the amounts individually assessed were not based on the special benefits the undergrounding project would confer on each assessed parcel].) The special benefit requirement is thus part and parcel of the proportionality requirement. It is useful, however, to separately discuss special benefits in order to ascertain whether the public improvement or property related service underlying the assessment confers *any* special benefits on district parcels in the first place. (*Silicon Valley, supra*, 44 Cal.4th at pp. 450–456 [discussing whether assessment to fund acquisition and maintenance of open space in County of Santa Clara conferred any special benefits on assessed properties].)

Article XIII D also limits an agency's ability to exempt publicly owned parcels from assessment: "Parcels within a district that are owned or used by any agency, the State of California or the United States shall not be exempt from assessment unless the agency can demonstrate by clear and convincing evidence that those publicly owned parcels in fact receive no special benefit." (Art. XIII D, § 4, subd. (a).)

In addition to its substantive requirements, article XIII D imposes "stricter procedural requirements" on agencies proposing to levy a real property assessment. (*Silicon Valley, supra*, 44 Cal.4th at p. 438.) "All assessments" are to be "supported by a detailed engineer's report." (Art. XIII D, § 4, subd. (b).) Written notice of a proposed assessment must be given to "record owners" of the properties proposed to be assessed, together with the date, time, and location of a public hearing on the assessment, to be conducted no fewer than 45 days after the notice is mailed. (*Id.*, subds. (c), (e).) The notice must include the amount to be assessed on the entire district, the amount chargeable to the owner's parcel, the reason for the assessment, its proposed duration, and the basis upon which the assessment was calculated. (*Id.*, subd. (c).) Each notice must also include a ballot and a statement disclosing that a "majority protest" against the assessment will result in the assessment not being imposed. (*Id.*, subds. (d), (e).)

At the noticed public hearing, the agency must "consider all protests," "tabulate the ballots," and "shall not impose an assessment if there is a majority protest." (Art. XIII D, § 4, subd. (e).) A majority protest exists if a majority of "ballots submitted in opposition to the assessment exceed the ballots submitted in favor . . . ." (*Ibid.*) In tabulating the ballots, voting must be weighed "according to the proportional financial obligation of the affected property." (*Ibid.*)[3]

---

[3] In 1997, the Legislature codified and detailed the notice, hearing, and protest procedures in the Proposition 218 Omnibus Implementation Act. (Gov. Code, § 53750 et seq.; *Silicon Valley, supra*, 44 Cal.4th at pp. 438–439, fn. 4.)

As the provisions of article XIII D illustrate, Proposition 218 was enacted in order "to 'significantly tighten the kind of benefit assessments' an agency can levy on real property (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) argument in favor of Prop. 218, p. 76) and to ' "protect[] taxpayers by limiting the methods by which local governments exact revenue from taxpayers without their consent." ' (Ballot Pamp., Gen. Elec., *supra*, text of Prop. 218, § 2, p. 108, reprinted in Historical Notes, 2A West's Ann. Const. (2008 supp.) foll. Cal. Const., art. XIII C, p. 85 (Historical Notes).)" (*Silicon Valley, supra*, 44 Cal.4th at p. 438.)

Before the voters passed Proposition 218, "courts did not invalidate assessments simply because they provided general benefits to the public in addition to the requisite special benefits . . . . [Citations.]" (*Silicon Valley, supra*, 44 Cal.4th at pp. 451–452, and cases cited.) In *Knox*, for example, the validity of an assessment for park maintenance, similar to the assessment in issue here, was upheld even though the city did not separate the general benefits accruing to people outside the area and the community at large from the special benefits the park maintenance assessment would confer on assessed residential parcels. (*Knox, supra*, 4 Cal.4th at pp. 137, 149.) Thus, *Knox* and other pre-Proposition 218 cases are not instructive in determining whether the special benefit and proportionality requirements of article XIII D have been met. (See *Silicon Valley, supra*, at p. 452.)

Further, under Proposition 218, the burden of proving that an assessment meets the special benefit and proportionality requirements is on the local government agency imposing the assessment. (*Silicon Valley, supra*, 44 Cal.4th at pp. 447–448.) Section 4, subdivision (f) of article XIII D states: "In any legal action contesting the validity of any assessment, the burden shall be on the agency to demonstrate that the property or properties in question receive a special benefit over and above the benefits conferred on the public at large and that the amount of any contested assessment is proportional to, and no greater than, the benefits conferred on the property or properties in question." This " 'burden . . . to demonstrate' provision" is to be construed "liberally in light of [Proposition 218's] other provisions." (*Silicon Valley, supra*, at p. 448.)

Finally, because Proposition 218's requirements involve matters of constitutional interpretation, or mixed questions of law and fact that implicate constitutional rights, courts are to "exercise their independent judgment in reviewing local agency decisions that have determined whether benefits are special and whether assessments are proportional to special benefits within the meaning of Proposition 218. [Citations.]" (*Silicon Valley, supra*, 44 Cal.4th at pp. 448–449.)

## III.  FACTS AND PROCEDURAL HISTORY

### A.  *Factual Background*

In 1999, three public parks in the then unincorporated community of Wildomar, namely, Marna O'Brien Park, Heritage Park, and Windsong Park, were closed after the Ortega Trail Recreation and Park District, which had been funding the parks' day-to-day operations, ran out of funds. Shortly thereafter, the Ortega Trail Recreation and Park District dissolved and the County took control of its assets and liabilities. In 2000, the County authorized extending park and recreation services to "County Service Area 152."[4] A portion of County Service Area 152, designated "Zone A," lay entirely within Wildomar and included the three closed parks.

In 2004, the County adopted a Park and Recreation Master Plan for County Service Area 152, Zone A (the Master Plan), and imposed a fee on new development in Wildomar in order to fund the acquisition and rehabilitation of park facilities. In 2005, the County adopted a series of resolutions in order to implement the Master Plan. Among other things, the resolutions authorized the acquisition and rehabilitation of the three closed parks. The rehabilitations were to include the development or construction of sports fields and courts, multiuse fields, bleachers, fitness equipment, walking paths, dog walking areas, benches, picnic tables, shelters, barbecue facilities, bike racks, parking lots, drinking fountains, irrigation for plants, trees, and turf, lighting, a windmill, a restroom, and a concession building.

In July 2006, the County adopted Resolution No. 2006-261 in order to initiate the formation of the Wildomar Landscape Maintenance District 2006-1 (District). The resolution stated that the purpose of the District was to levy annual assessments on "parcels" within the community of Wildomar, beginning with the fiscal year 2006–2007, in order to fund the *costs of maintaining landscaping* in the three closed parks and in a new 10-acre park to be named Wildomar Park East. The proposed assessment was to pay for "(a) [t]he furnishing of services and materials for the ordinary and usual maintenance, operation, and servicing of the landscaping appurtenances including repair, removal or replacement, providing for the life and growth, health, and beauty of the landscaping," and "(b) [t]he removal of trimmings, rubbish, debris, and other solid waste, together with the necessary incidental expenses."[5]

---

[4] A county service area is a district within a county to which a particular service or services are provided and for which fees and assessments are charged to fund the services. (Gov. Code, § 25210 et seq.)

[5] The Landscaping and Lighting Act of 1972 (Sts. & Hy. Code, § 22500 et seq.) authorizes local government agencies to establish assessments for districts and to levy assessments for

Resolution No. 2006-261 designated Albert A. Webb Associates (Webb) as the County's engineer, and ordered the preparation of an engineer's report for the proposed District and assessment (the Engineer's Report or Report). The resolution further directed that proceedings for the formation of the District were to comply with article XIII D and section 4000 of the Elections Code.

Also in July 2006, the County adopted a second resolution, Resolution No. 2006-262, approving the Report, declaring the County's intent to form the District, and giving notice of a public hearing on the Report and proposed assessment. This resolution referred to the Report for a full description of the services to be provided, the boundaries of the District, the amount of the assessment to be levied, and other particulars.

According to the Report, there were 6,858 assessable parcels in the District, consisting of 6,858 single-family residential or dwelling units. The Report apportioned the costs of the assessment equally among these units on an "equivalent dwelling unit" or "EDU" basis. Webb determined that each single-family residential unit in the community of Wildomar would benefit equally from the proposed assessment, or from maintaining landscaping in the four public parks. All commercial and industrial properties, vacant land, a senior citizen's retirement community, and all publicly owned properties were excluded from the District and the assessment on the ground none of them would specially benefit from the assessment. All future developed single-family residential units were to be annexed into the District.

The amount of the proposed assessment was $28 per residential dwelling unit for the 2006–2007 fiscal year and was to increase to not more than $45 per residential dwelling unit, adjusted for inflation, beginning in the year in which the landscaping improvements for Wildomar Park East were completed. These figures were based on the annual budget for the District, or the annual costs of maintaining the parks' landscaping, divided by 6,858, the number of residential dwelling units in the District. The budget for the 2006–2007 fiscal year was $192,415 and was expected to increase to $308,610 following the completion of Wildomar Park East ($192,415/6,858 equals $28; $308,610/6,858 equals $45).

In the Report under the heading "Special Benefits," Webb determined that maintaining the landscaping in the four parks would confer "direct and special benefits, which will enhance all properties within the Landscape Maintenance District. Said benefits will include the following items. [¶] 1. Promotion of walking and other physical activity at parks maintained facilities by offering marked and improved trails and exercise stations. [¶] 2. Group picnics shelters

landscaping and lighting improvements, including assessments for the maintenance or servicing of existing landscaping (*Knox, supra,* 4 Cal.4th at pp. 138–139).

for large gatherings. [¶] 3. Restroom and concession facilities. [¶] 4. Playground and Tot Lot areas. [¶] 5. Sports fields and courts available for active recreation."

Under the heading "General Benefits," the Report stated: "It is recognized that the general public may benefit from these parks. However, the benefits to the general public will be offset by the County's payoff of the debt incurred by [the Ortega Trail Recreation and Park District], when [the County] acquired the park properties. The payoff totaled $633,992. Additionally County Funds of approximately $6,000,000 will be used to refurbish the parks with new playing fields, landscaping, structures, and other recreational appurtenances. Also on an annual basis the County proposes to contribute approximately $75,000 for the purpose of funding recreational programs."

Resolution No. 2006-262 directed that the owner of record of each residential dwelling unit was to receive an assessment ballot by mail. The assessment was not to be levied if, upon the conclusion of the public hearing, there was a majority protest—that is, if the ballots in opposition to the proposed District and assessment exceeded the ballots in favor.

On August 29, 2006, the County Board of Supervisors conducted a public hearing on the proposed District and assessment. On August 30, the ballots were tabulated, and votes representing 2,012 of 6,858 parcels were cast. A total of 1,121 votes, or 55.72 percent of the 2,012 votes cast, were in favor of the District and assessment, and 891 votes were in protest. On September 12, the County adopted Resolution No. 2006-375, ordering the formation of the District and levying the assessment.

### B. *Procedural History*

In December 2006, Beutz, filed a second amended complaint challenging the County's formation of the District and levy of assessment in eight causes of action. In August 2007, Beutz was denied leave to file a third amended complaint which would have added a ninth cause of action, alleging the assessment was enacted in violation of the balloting provisions of article XIII D. Beutz later dismissed all but his second and third causes of action.

In his second and third causes of action, Beutz alleged that, in forming the District and approving the assessment, the County violated article XIII D, section 4, subdivision (a) in (1) assessing the entire cost of refurbishing and maintaining the parks' landscaping on residential properties, without deducting any portion of the costs attributable to the general benefits the landscaping would confer on nonresidential properties or members of the general

public (second cause of action), and (2) exempting 150 publicly owned parcels from the assessment, without clear and convincing evidence these parcels would receive no special benefit from the landscaping (third cause of action).

In October 2007, Beutz filed a motion for summary judgment/adjudication on his second and third causes of action. Before the hearing on the motion, the County moved for summary judgment/adjudication on the same two causes of action based largely on the undisputed facts presented in Beutz's motion. The trial court denied Beutz's motion, granted the County's motion, and entered judgment in favor of the County after concluding the assessment was not constitutionally invalid for either of the reasons Beutz claimed. This appeal followed.

## IV. DISCUSSION

We conclude that Beutz, not the County, was entitled to summary judgment on Beutz's second cause of action. For this reason, we need not address the alternative claims Beutz raises on this appeal.[6]

### A. *Standard of Review*

We begin by setting forth the rules governing our review of the trial court's order denying Beutz's motion for summary judgment on his second cause of action, together with its subsequent order granting summary judgment in favor of the County on the same cause of action. As indicated, the facts adduced in support of both motions were substantially the same and are undisputed.

The trial court ruled that the County, rather than Beutz, was entitled to summary judgment on Beutz's second cause of action because the County demonstrated that the assessment satisfied the special benefit and proportionality requirements of article XIII D. (Art. XIII D, § 4, subd. (a).) The trial court was persuaded that the County's payment of more than $6 million to acquire the parks, retire park debt, refurbish the parks, and pay for park

---

[6] Beutz alternatively claims the trial court (1) erroneously denied his motion for summary judgment on his third cause of action, in which he alleged the County exempted 150 publicly owned parcels from the assessment without clear and convincing evidence the publicly owned parcels would receive no special benefit, and (2) abused its discretion in denying his motion for leave to file a third amended complaint adding a (ninth) cause of action alleging the assessment violated the balloting provisions of article XIII D. Regarding Beutz's second alternative claim, the County requested we take judicial notice of portions of the legislative history of the Proposition 218 Omnibus Implementation Act. (Gov. Code, § 53750 et seq.) Because we do not reach Beutz's second alternative claim, we do not consider the County's request for judicial notice.

recreational programs "probably substantially outweigh[ed] the cost to the people who will actually use the parks."

Summary judgment is properly granted when there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1250 [91 Cal.Rptr.3d 532, 203 P.3d 1127]; Code Civ. Proc., § 437c, subd. (c).) A moving party defendant is entitled to summary judgment on a cause of action if, for example, it shows that one or more elements of the plaintiff's cause of action cannot be established. (Code Civ. Proc., § 437c, subds. (b), (*o*); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 [107 Cal.Rptr.2d 841, 24 P.3d 493].) Conversely, a moving party plaintiff is entitled to summary judgment if it proves each element of a cause of action entitling him to judgment on that cause of action. (*Aguilar v. Atlantic Richfield Co., supra*, at p. 849.)

" 'On appeal after a motion for summary judgment [or summary adjudication] has been granted [or denied], we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.]' [Citations.] 'The purpose of the law of summary judgment [and summary adjudication] is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citation.]' [Citation.]" (*Federal Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 345 [84 Cal.Rptr.3d 38].)

In response to Beutz's motion and in support of its own motion, the County had the burden of demonstrating that the assessment satisfied the special benefit and proportionality requirements of article XIII D. (Art. XIII D, § 4, subd. (f).) Whether the County met its burden of demonstrating that the assessed properties received special benefits over and above general benefits and whether the assessment was proportional to, and no greater than, those special benefits are constitutional questions subject to this court's independent judgment or de novo review. (*Silicon Valley, supra*, 44 Cal.4th at pp. 448–450.) The County argues, however, that the independent judgment standard has its limits and does not extend to legislative determinations by the County's elected officials, such as what projects to undertake, when to do so, the scope of a project, or how much of a special benefit should be funded by a special assessment. (See *City and County of San Francisco v. Sainez* (2000) 77 Cal.App.4th 1302, 1313 [92 Cal.Rptr.2d 418] [constitutional questions are subject to independent or de novo review, but underlying factual findings are reviewed for substantial evidence].) As will appear, no deference is owed to any of the County's determinations in issue on this appeal.

B. *Analysis*

To reiterate, in his second cause of action Beutz claimed the County failed to separate the general benefits from the special benefits of refurbishing and maintaining the parks' landscaping, deduct the general benefit portion, and base the assessment only on the special benefits portion. (Art. XIII D, § 4, subd. (a).) More specifically, Beutz claimed that, because the assessment was based solely on the costs of rehabilitating and maintaining the parks' landscaping, the touchstone of the County's general/special benefit analysis was the landscape rehabilitation and maintenance portion of the Master Plan, not the Master Plan as a whole.

The County argues, and the trial court agreed, that article XIII D does not support Beutz's assessment-based approach to the general/special benefit analysis. Instead, the County argues that article XIII D required it to determine the amount of any assessable special benefits by analyzing the general and special benefits of the *entire* Master Plan, not just the landscaping component of the plan. We agree.

As the County points out, article XIII D plainly states: "The proportionate special benefit derived by each identified parcel shall be determined in relationship to *the entirety of the capital cost of a public improvement, the maintenance and operation expenses of a public improvement, or the cost of the property related service being provided.*" (Art. XIII D, § 4, subd. (a), italics added.) As the County also argues, the "property related service being provided,"[7] was the implementation of the *entire* Master Plan, not just the landscaping component of the plan.[8]

■ If, as Beutz claims, the touchstone of the general/special benefit analysis were the costs and benefits associated with the assessment, rather than the entire Master Plan of which the assessment is a part, then the second

---

[7] A " '[p]roperty-related service' " is defined as "a public service having a direct relationship to property ownership." (Art. XIII D, § 2, subd. (h).) " 'Capital cost' means the cost of acquisition, installation, construction, reconstruction, or replacement of a permanent public improvement by an agency," (*id.*, subd. (c)), and " '[m]aintenance and operation expenses' " is defined as "the cost of rent, repair, replacement, rehabilitation, fuel, power, electrical current, care, and supervision necessary to properly operate and maintain a permanent public improvement" (*id.*, subd. (f)).

[8] Beutz does not dispute that the property related service provided was the entire Master Plan; he only claims it was not the touchstone of the County's general/special benefit analysis. Further, the County suggests, and we agree, that the County was required to use the entire Master Plan as the basis of its general/special benefit analysis because there was no practical alternative basis for the analysis. We express no opinion, however, whether local governmental agencies have discretion to determine the basis of the general/special benefit analysis in other contexts, particularly when the public improvement project or property related service provided is reasonably divisible into component parts.

sentence of section 4, subdivision (a) of article XIII D would be superfluous. Moreover, the second sentence recognizes, as courts of this state have long recognized, that virtually all public improvement projects provide general benefits. (*Silicon Valley, supra,* 44 Cal.4th at p. 443 ["public improvements often provide both general benefits to the community and special benefits to a particular property . . ."]; *City of Livermore v. Pacific Gas & Electric Co.* (1997) 51 Cal.App.4th 1410, 1417 [59 Cal.Rptr.2d 852] ["A public park confers broad public benefits . . ."]; *Mills v. City of Elsinore* (1928) 93 Cal.App. 753, 769 [270 P. 224] ["[E]very assessment proceeding contains an element of public benefit."]; but see *City of Saratoga v. Hinz* (2004) 115 Cal.App.4th 1202, 1225 [9 Cal.Rptr.3d 791] [improved street access to cul-de-sac not used for "thru-traffic" conferred no general benefits].) Precisely because public improvement projects often provide general benefits, agencies are required to separate the general from the special benefits of the public improvement project, and base the assessment solely on the special benefit portion of the project. (*Silicon Valley, supra,* at p. 443; art. XIII D, § 4, subd. (a).)[9]

Further, the written notice provisions of article XIII D ensure that record owners of properties proposed to be assessed will be informed of the nature and extent of the *entire* project underlying a proposed assessment. (Art. XIII D, § 4, subd. (c) [written notice of a proposed assessment must include "the total amount . . . chargeable to the entire district, the amount chargeable to the owner's particular parcel, the duration of the payments, the reason for the assessment and the basis upon which the amount of the proposed assessment was calculated . . ."].) By requiring written notice of "the total amount . . . chargeable to the entire district," together with the "basis upon which the amount of the proposed assessment was calculated," the notice provisions contemplate that proposed assessments on individual properties may be based on a public improvement project that is broader in scope than the specific improvement to be funded by the assessment. As such, the notice provisions support the County's position that it was required to analyze the general and special benefit of the entire Master Plan.

Accordingly, we agree with the County that the aggregate assessment imposed on all Wildomar residential properties was properly based, at least in theory, on the special benefit portion of the entire Master Plan. This is not to

---

[9] The County further argues Beutz fails to recognize the relationship between Proposition 218, which limits an assessment to the value of the special benefit conferred by an entire public improvement project, and the Landscaping and Lighting Act of 1972 (Sts. & Hy. Code, § 22500 et seq.), which authorizes an assessment only for landscaping and maintenance services (see Sts. & Hy. Code, § 22525).

say, however, that the County met its burden of demonstrating that the assessment was commensurate with or at least did not exceed the special benefit portion of the Master Plan. (Art. XIII D, § 4, subd. (f).) For the reasons we explain, the County did not meet this burden.

The County argues its Engineer's Report "properly segregated general and special benefits," and that the general benefit portion of the Master Plan was funded from nonassessment sources, namely, the County's payment of $6 million for park improvements, its additional payment of $633,992 to retire the debt owed by its predecessor, the Ortega Trail Recreation and Park District, and its anticipated payments of $75,000 per year to fund park recreational programs. Thus, the County argues, it properly assessed Wildomar residential property owners *only* for the ongoing costs of maintaining the parks' landscaping, because the larger capital costs of acquiring, improving, and refurbishing the parks, including the costs of installing the landscaping, was to be borne by the County.

The trial court took judicial notice of a pamphlet titled "Understanding Proposition 218," issued by the Legislative Analyst in December 1996. Under the heading *"Estimate the Amount of Special Benefit,"* the pamphlet states: "Local government must use a professional engineer's report to estimate the *amount* of special benefit landowners would receive from the project or service, as well as the *amount* of 'general benefit.' This step is needed because Proposition 218 allows local government to recoup from assessments only the proportionate share of cost to provide the special benefit. That is, if special benefits represent 50 percent of total benefits, local government may use assessments to recoup half the project or service's costs. Local governments must use other revenues to pay for any remaining costs. This limitation on the use of assessments represents a major change from the law prior to Proposition 218, when local governments could recoup from assessments the costs of providing both general and special benefits."

As the pamphlet indicates, separating the general from the special benefits of a public improvement project *and* estimating the *quantity* of each in relation to the other is essential if an assessment is to be limited to the special benefits. (Art. XIII D, § 4, subd. (a).) Nowhere, however, does the Engineer's Report *separate and quantify* the general and special benefits to be realized from the implementation of the entire Master Plan. Instead, the Report assumes—without supporting evidence or analysis—that the general benefits of the Master Plan will be "offset" by the County's expenditures of over $6,633,992 to acquire and refurbish the parks and retire park debt, and its anticipated annual expenditures of approximately $75,000 to fund park recreational programs. The magnitude of the County's expenditures relative to the amount of the annual assessments begs the question, however, of

whether the general benefits of the parks outweigh the special benefits to district properties in the proportion the Report suggests.[10]

Missing from the Report is an analysis of the *quantity* or extent to which the general public may reasonably be expected to use or benefit from the parks in relation to the *quantity* or extent to which occupants of Wildomar residential properties, either in the aggregate or individually, may use or benefit from the parks. (Art. XIII D, § 4, subd. (b) ["All assessments shall be supported by a detailed engineer's report . . ."].) Though the Report concedes that the general public may benefit from the parks, we are unable to infer, based on the Report, how often or to what extent persons who live inside and outside Wildomar may reasonably be expected to use the parks. Persons from surrounding communities such as Lake Elsinore, Murrietta, and Canyon Lake may be attracted to the parks in large numbers and on a regular basis if similar park facilities are unavailable in their communities. In addition, the parks may offer prime sports facilities and be centrally located for purposes of Little League playoffs, soccer tournaments, and similar events which attract players and their families from surrounding communities and even other counties.

Also missing from the Report is an analysis, in the first instance, of how or to what extent *all* Wildomar residential properties in the aggregate, or specific Wildomar residential properties in particular, will specially benefit from their occupants' anticipated use of the parks. (*Silicon Valley, supra,* 44 Cal.4th at p. 452 [discussing how to determine whether benefits are special].) It is by no means clear from the Report that occupants of Wildomar residential properties will use or benefit from the parks in a different manner, or more intensively, than persons from other communities. Nor does the Report address whether Wildomar residents who live in close proximity to one or more of the parks may reasonably be expected to use those parks just as often, over time, as Wildomar residents who live several miles away from the same parks.

These deficiencies in the Report are of constitutional proportions. The Report does not satisfy the County's two-part constitutional burden of demonstrating that (1) the parks will confer special benefits on all Wildomar

---

[10] Though the Report suggests the County's expenditures far exceed the amount of the assessment, the proportion cannot be gauged because the assessment was not discounted to present value using any interest rate over the duration of the assessment. Further, we question whether the County's anticipated annual expenditures of $75,000 to fund park recreational programs should be included in any calculation of general to special benefits if the County has not made, and is not legally required to make, the expenditures.

residential properties, and (2) the amount of the assessment on *each* Wildomar residential parcel is "proportional to, and no greater than," the special benefits conferred on that parcel. (Art. XIII D, § 4, subd. (f).) Had the Report *separated and quantified* the general and special benefits of the Master Plan based on solid, credible evidence and purported to base the assessment solely on the special benefits, the substantial evidence standard of review may have applied to the Report's implicit conclusions that all Wildomar properties would specially benefit from the parks in equal measure, and that the assessment on each parcel was proportional to and no greater than those special benefits. (See, e.g., *City and County of San Francisco v. Sainez, supra*, 77 Cal.App.4th at p. 1313 [substantial evidence standard of review applies to factual findings underlying constitutional determinations].) The Report, however, fails to explain the nature and extent of the general and special benefits of the parks or quantify both in relation to each other based on credible, solid evidence.

At oral argument, the County suggested that our tentative opinion invalidating the assessment on the ground the County failed to meet its burden of demonstration was based on issues Beutz did not raise in the trial court and has not raised on this appeal. The County appears to be arguing that, because Beutz's second cause of action challenged the assessment solely on the ground it failed to separate and quantify the general and special benefits *of the landscape maintenance portion* of the Master Plan, Beutz has *waived* any claim that the assessment is invalid because the County failed to separate and quantify the general and special benefits *of the entire Master Plan*. The County's argument misunderstands the County's burden of demonstration and when this burden arose.

Though the pleadings delimit the issues to be considered on a motion for summary judgment, and a plaintiff on a motion for summary judgment cannot bring up new, unpleaded issues in his moving or opposing papers (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1253 [78 Cal.Rptr.3d 372] [Fourth Dist., Div. Two]), the County's constitutional burden of demonstration arose as soon as Beutz challenged the validity of the assessment, on any ground, and moved for summary judgment. Likewise, the County's burden of demonstration arose when the County moved for summary judgment on Beutz's second and third causes of action, both of which challenged the validity of the assessment.

■ As indicated, article XIII D, section 4, subdivision (f) plainly states: "In *any* legal action contesting the validity of any assessment, the burden shall be on the agency to demonstrate that the property or properties in

question receive a special benefit over and above the benefits conferred on the public at large and that the amount of any contested assessment is proportional to, and no greater than, the benefits conferred on the property or properties in question." (Italics added.) By its plain terms, section 4, subdivision (f) means that, regardless of the ground or grounds a plaintiff pleads in challenging the validity of an assessment, the burden of proof at trial, including summary judgment, is on the agency to demonstrate that the assessment meets the special benefit and proportionality requirements of article XIII D.

As discussed in *Silicon Valley, supra,* 44 Cal.4th at pages 445 and 446, the burden of demonstration provision was intended to curtail local government agencies' discretion in imposing assessments and "to make it more difficult for an assessment to be validated in a court proceeding." Furthermore, the special benefit and proportionality requirements are essential to Proposition 218's purpose of strictly limiting special assessments to special benefits conferred on assessed parcels. In service of Proposition 218's essential purpose, the burden of demonstration provision ensures that no assessment will survive a challenge to its validity, on any ground, unless the agency proves the assessment meets the fundamental special benefit and proportionality requirements. Simply put, it is not for a plaintiff challenging the validity of an assessment to place the special benefit and proportionality requirements in issue. These requirements are always in issue in *any* legal action challenging the validity of an assessment and the burden of demonstrating they have been met is always on the agency. (Art. XIII D, § 4, subd. (f).)

We further observe that the Report's implicit but unsupported conclusion that the assessment was based solely on the parks' special benefits to assessed properties *at least appears* to be cost driven rather than special benefit driven. That is, the assessment appears to be based solely on the annual costs of refurbishing and maintaining the parks' landscaping rather than on the special benefits the parks will confer on assessed parcels. In this respect, the assessment is similar to the one held invalid in *Tiburon.*

The Town of Tiburon formed a special assessment district in order to pay the costs of placing overhead utility lines underground within the district. (*Tiburon, supra,* 180 Cal.App.4th at p. 1063.) Because the construction costs of placing the lines underground varied throughout the district, the town's engineer divided the district into three separate "benefit zones," which the court characterized as "cost zones." (*Id.* at pp. 1066, 1082.) Though the engineer determined that most of the properties in the district would receive

the same degree or quantity of special benefits from placing the utility lines underground, the properties were assessed one of three different assessment amounts, depending upon the location of the property within the three benefit or cost zones. (*Id.* at pp. 1065–1066.)

The *Tiburon* court concluded that the assessment violated article XIII D, in part because it was based on a neighborhood-by-neighborhood determination of the costs of the public improvement, rather than on the cost of the public improvement as a whole. (Art. XIII D, § 4, subd. (a) ["The proportionate special benefit derived by each identified parcel shall be determined in relationship to the entirety of the capital cost of a public improvement . . ."]; *Tiburon, supra*, 180 Cal.App.4th at pp. 1082–1083.) Further, the assessment was not levied on each district parcel in proportion to the special benefits conferred on each parcel. (*Tiburon, supra*, at p. 1083.)

The court in *Tiburon* recognized that, although "[t]here may be cases in which the relative cost of an improvement is a reliable measure of relative benefit conferred," the Town of Tiburon, through its engineer's report, did not tie the special benefits conferred on each parcel to the costs assessed on each parcel. (*Tiburon, supra*, 180 Cal.App.4th at pp. 1083–1084.) The court concluded: "[P]roportionate special benefit is the basis upon which a project's total assessable costs are apportioned among parcels within an assessment district. This method ensures that each property owner pays an equitable share of the overall assessable cost as measured by the relative special benefit conferred on the property." (*Id.* at p. 1084.) In sum, the town's "three benefit zone" apportionment method was invalid because it was "largely based on cost considerations rather than proportional special benefits." (*Id.* at pp. 1080–1081.)

Like the undergrounding assessment in *Tiburon*, the assessment here at least appears to be based on the ongoing annual costs of refurbishing and maintaining the parks' landscaping, rather than on the special benefits the entire Master Plan will confer on Wildomar residential properties. This is not to say, however, that the assessment could not have been sufficiently supported by a more detailed engineer's report that both separated and quantified the general benefits and the special benefits conferred by the implementation of the entire Master Plan. Just as the Town of Tiburon *may* have been able to properly support its undergrounding assessment based on the costs of the undergrounding project to various properties, the County may have been able to support the assessment on Wildomar residential properties based on the costs of maintaining the parks' landscaping provided those costs were proportional to, and did not exceed, the special benefits to the assessed parcels. (Art. XIII D, § 4, subds. (a), (f).)

Lastly, we observe that the County's reliance on *Dahms v. Downtown Pomona Property & Business Improvement Dist.* (2009) 174 Cal.App.4th 708 [96 Cal.Rptr.3d 10] (*Dahms*) is misplaced. There, the City of Pomona formed a special assessment district consisting of downtown Pomona properties in order to fund specific services for the properties, including security, streetscape maintenance, marketing, promotion, and special events. (*Id.* at pp. 712–713.) The assessment was challenged on the ground the special benefits to the downtown properties also produced general benefits to the broader community in terms of increased property values and increased safety for the general public. (*Id.* at p. 723.) The challenger argued the assessment was invalid because it was based on the entire costs of providing the services to the downtown properties, with no deduction for the portion of the costs attributable to the general benefits the services would confer on the public and surrounding properties.

The *Dahms* court rejected the claim on the ground article XIII D did not support it. The court reasoned: "[N]othing in article XIII D says or implies that if the special benefits that are conferred also produce general benefits, then the value of those general benefits must be deducted from the reasonable cost of providing the special benefits before the assessments are calculated. Rather, the only cap the provision places on the assessment is that it may not exceed the reasonable cost of the proportional special benefit conferred on that parcel." (*Dahms, supra*, 174 Cal.App.4th at p. 723.)

Here, the County argues that the general benefits the public may enjoy from the use of the Wildomar parks is no different from the general benefits the public or outlying parcels enjoyed from the services assessment on the downtown Pomona properties in *Dahms*. For this reason, the County argues, the assessment on Wildomar residential properties is not required to be reduced by the general benefits that the use of the parks will confer on members of the general public. The County misreads the import of *Dahms*.

Unlike *Dahms*, this is not a case in which services specifically intended for assessed parcels concomitantly confer collateral general benefits to surrounding properties. Rather, this case involves the failure to separate and quantify the general and special benefits that will accrue, respectively, to members of the general public and occupants of Wildomar residential properties from their common use and enjoyment of the Wildomar parks. The Wildomar parks, like all public parks, will be used by the public at large at least to some extent. The County acknowledges it was required to fund the general benefit portion of the Master Plan from nonassessment sources, and argues it did so. For the reasons explained, however, the Engineer's Report is insufficient to support the County's argument.

## V. DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with directions to enter judgment in favor of Beutz and against the County on the second cause of action of Beutz's second amended complaint. The trial court shall issue a judgment vacating the County's Resolution No. 2006-375 and invalidating the assessment levied by Wildomar Landscape Maintenance District 2006-1. The parties shall bear their respective costs on this appeal.

McKinster, Acting P. J., and Gaut, J., concurred.

A petition for a rehearing was denied June 24, 2010, and respondent's petition for review by the Supreme Court was denied September 15, 2010, S184226. Kennard, J., was of the opinion that the petition should be granted.