Filed 2/16/23  Hill RHF Housing Partners v. City of Los Angeles CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| HILL RHF HOUSING PARTNERS, L.P., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF LOS ANGELES, et al., <br><br> Defendants and Respondents. | B295181 <br><br> (Los Angeles County Super. Ct. No. BS170127) <br><br> ORDER MODIFYING OPINION AND DENYING REHEARING <br><br> [NO CHANGE IN JUDGMENT] |
| MESA RHF PARTNERS, L.P., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF LOS ANGELES, et al., <br><br> Defendants and Respondents. | B295315 <br><br> (Los Angeles County Super. Ct. No. BS170352) |

THE COURT:

It is ordered that the opinion filed herein on January 20, 2023, be modified as follows:

1.    At the end of the first full sentence on page 32 (quoting from *Dahms* "No assessment [may] . . . exceed[ ] the *reasonable cost* of the proportional special benefit conferred on that parcel.") add as footnote 3 the following footnote:

In their petitions for rehearing, petitioners argue that BID discounts for nonprofit entities and residential properties in the BID underlying *Dahms* means that the "BID at issue in *Dahms* took the benefits conferred on each parcel into much greater consideration than the BIDs at issue on this appeal" and urge us to grant rehearing "to consider the importance of these distinctions."  In *Dahms*, the BID discounted properties belonging to "nonprofit entities ('religious organizations, clubs, lodges and fraternal organizations')" (*not subject to any distinction for property use*) and—separately—any properties "zoned exclusively residential."  (*Dahms*, *supra*, 174 Cal.App.4th at p. 713.)

In contrast to the petitioners' arguments here—that their nonprofit status *must* be accounted for—the argument in *Dahms* was that "the assessments for properties owned by nonprofit entities, such as fraternal organizations and churches," violated Proposition 218 because " '[t]he assessments are not proportional to the benefits received because the assessments are discounted.' "  (*Dahms*, *supra*, 174 Cal.App.4th at p. 716.)  In other words, Dahms argued that the BID *could not* discount based on nonprofit status

2

under Proposition 218.  *That* is the argument we rejected in *Dahms*.  (*Ibid*.)

Cases are not authority for arguments that were not considered.  (*Howard Jarvis Taxpayers Assn. v. Newsom* (2019) 39 Cal.App.5th 158, 169.)  We will not rely on *Dahms* as authority to require a BID to consider a property owner's nonprofit status in a proportionality analysis.

There is no change in judgment.

Appellants' petition for rehearing is denied.

_____
ROTHSCHILD, P. J.          CHANEY, J.          BENDIX, J.

3

Filed 1/20/23  Hill RHF Housing Partners v. City of Los Angeles CA2/1 (unmodified opinion)
Opinion following transfer from Supreme Court
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| HILL RHF HOUSING PARTNERS, L.P., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF LOS ANGELES, et al., <br><br> Defendants and Respondents. | B295181 <br><br> (Los Angeles County Super. Ct. No. BS170127) |
| MESA RHF PARTNERS, L.P., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF LOS ANGELES, et al., <br><br> Defendants and Respondents. | B295315 <br><br> (Los Angeles County Super. Ct. No. BS170352) |

APPEALS from judgments of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge.  Affirmed.

Reuben Raucher & Blum, Timothy D. Reuben and Stephen L. Raucher for Plaintiffs and Appellants.

Michael N. Feuer, City Attorney, Beverly A. Cook, Assistant City Attorney, and Daniel M. Whitley, Deputy City Attorney, for Defendant and Respondent City of Los Angeles.

Colantuono, Highsmith & Whatley, Michael G. Colantuono, Holly O. Whatley, and Pamela K. Graham for Defendants and Respondents Downtown Center Business Improvement District Management Corporation and San Pedro Property Owners Alliance.

_____

"State law provides for the formation of business improvement districts, or BIDs, through which services, activities, and improvements may be funded by assessments imposed on benefitted business or properties.  When a BID is subsidized by assessments upon real property, these levies must comply with the Right to Vote on Taxes Act, an initiative measure more commonly known as Proposition 218," which was approved by voters on November 5, 1996.  (*Hill RHF Housing Partners, L.P. v. City of Los Angeles* (2021) 12 Cal.5th 458, 468 (*Hill*).)

The City of Los Angeles created the Downtown Center Business Improvement District (DCBID) in 1998 and the San Pedro Historic Waterfront Business Improvement District (SPBID) in 2007 pursuant to the Property and Business Improvement District Law of 1994 (the PBID Law).  (Sts. & Hy. Code, § 36600, et seq.)  Hill RHF Housing Partners, L.P. (Hill), Hill Olive Housing Partners, L.P. (Olive), and Mesa RHF

2

Partners, L.P. (Mesa) (collectively petitioners) filed petitions for writ of mandate in the trial court alleging various causes of action challenging the 2017 renewal of the two BIDs.

The petitioners' challenges fall into three categories of contentions petitioners make in this court. First, petitioners argue that the BIDs' assessments are unconstitutional under Proposition 218 because they rely on facially unconstitutional legislative amendments to the PBID Law. Second, petitioners contend that the BIDs' assessments are themselves unconstitutional because the assessments are not based solely on special benefits, the engineers' reports upon which the assessments are based fail to separate general benefits from special benefits, and the BIDs failed to consider the unique circumstances of the petitioners' properties in levying the assessments. Third, petitioners contend that the engineers' reports upon which the BIDs based their assessments are legally insufficient to support the assessments. Because the assessments are invalid for any one of these reasons, petitioners contend, they constitute taxes, from which the petitioners are exempt.

The trial court rejected the petitioners' arguments, relying largely on this court's opinion in *Dahms v. Downtown Pomona Property & Business Improvement Dist.* (2009) 174 Cal.App.4th 708 (*Dahms*), and entered judgment for the City on both petitions. We also disagree with the petitioners, and will affirm the trial court's judgments.

## BACKGROUND

The Supreme Court recited much of the relevant procedural and factual background, which we draw on here, in its opinion in *Hill, supra,* 12 Cal.5th 458.

3

The petitioners "are nonprofit providers of housing and services to low-income seniors. Mesa owns real property, known as Harbor Tower, in San Pedro. Hill owns a property known as Angelus Plaza and Olive owns another property, Angelus Plaza North, in downtown Los Angeles. Harbor Tower is within the boundaries of the [SPBID], and the Angelus Plaza and Angelus Plaza North properties are within the [DCBID].

"These two BIDs were created pursuant to the [PBID Law]. The [SPBID] was originally established in [2007]; the [DCBID] in 1998. In 2012, petitioners brought legal challenges against these BIDs. Those disputes were resolved through settlement agreements, reached in 2013, in which it was determined that the City of Los Angeles would reimburse petitioners for their BID assessment payments.

"In 2017 [the City of Los Angeles] proposed that the [BIDs] be renewed for 10-year terms. Each proposal engaged the process for approving a BID, as set out in the PBID Law, Proposition 218, and the Proposition 218 Omnibus Implementation Act (Gov. Code, § 53750 et seq. . . .). As part of this process, the Los Angeles City Council . . . adopted two ordinances, one for each BID, expressing an intent to consider the establishment of the BID. Each of these ordinances adopted and approved a detailed management district plan and associated engineer's report for the relevant BID, provided a general description of the BID's boundaries, gave the total projected assessment for the BID over its 10-year term as well as for its first year, identified the number of assessed parcels in the proposed BID (804 parcels owned by 270 stakeholders for the [SPBID]; 2,865 parcels owned by 1,710 stakeholders for the [DCBID]), and summarized the improvements and activities to be undertaken through the BID.

4

For each BID, the appropriate ordinance also announced the date, time, and place of a public hearing before the City Council at which, per the ordinances, 'all interested persons will be permitted to present written or oral testimony, and the City Council will consider all objections or protests to the proposed assessment' used to fund the BID." (*Hill*, *supra*, 12 Cal.5th at pp. 469-470.)

The petitioners received notices of the public hearings before the City Council, and their authorized representatives voted against establishment of the BIDs. (*Hill*, *supra*, 12 Cal.5th at p. 470.) "Meanwhile, on the same day as the hearing on the [SPBID] (which took place three weeks after the hearing on the [DCBID]), a City of Los Angeles representative advised petitioners' counsel that due to differences between the BIDs as formerly constituted and as renewed, the previously negotiated 2013 settlement agreements—which by their terms applied for so long as the earlier-established BIDs 'continue[d] in [their] current formulation[s]'—were no longer in effect.

"When all ballots were counted, petitioners were substantially outvoted; there was no majority protest against either BID. Shortly after each tabulation, the City Council adopted an ordinance regarding the relevant BID, announcing in each instance that the City Council had 'heard all testimony and received all evidence concerning the establishment of the District and desires to establish the District.' " (*Hill*, *supra*, 12 Cal.5th at pp. 470-471.)

**A. The SPBID**

According to the engineer's report supporting the SPBID renewal, the SBPID "incorporates two dynamic centers: [¶] A) The revitalized pedestrian oriented Historic Downtown San

5

Pedro [teeming] with unique shops, restaurants, offices, entertainment venues[,] and mixed use newer developments, and [¶] B) The international based Port of Los Angeles—a hub of tourism, culture, commerce and recreation." The SPBID's Management District Plan indicates that SPBID "include[s] a mix of retail, office, entertainment, light industrial, manufacturing, . . . parking, residential[,] and government facilities." SPBID is divided into three benefit districts, with some SPBID activities designated for all districts, but others designated for less than the entire SPBID. As an example, "Ambassador/Security Services," described below, "are only provided within Benefit Zone 1 with none in Benefit Zones 2 or 3. Zones 2 and 3 are patrolled by the Port of Los Angeles Police Department." And "Sidewalk pressure washing," part of SPBID's "Sanitation & Beautification/Capital Improvements," "is provided at least 4 times a year in Benefit Zone 1 and only as needed in Benefit Zones 2 and 3."[1]

SPBID intended to fund services and activities in the three benefit zones by assessments specific to those benefit zones: "Assessment funds collected from each benefit zone will only be spent on services provided within that benefit zone."

In addition to district management and administration, the SPBID was to provide "Visitor, Ambassador, and Security services[,] [¶] Sanitation, Beautification, & Capital Improvements such as monument signs, landscaping and other streetscape improvements[,] [¶] [and] Marketing and Special Events." "Visitor & Ambassador/Security Services" includes,

_____

[1] This is not an exhaustive list of the distinctions between the three zones, rather is included to provide examples of the differences in services between the three SPBID benefit zones.

6

among other services, shuttle services, visitor kiosks with maps and brochures, "wayfinding signage, monument signage[,] and high technology advances to automate and enhance various Visitor Program elements." "Ambassador/Security Services uses uniformed ambassadors that provide security services . . . by reporting crime to [the Los Angeles Police Department] and the Port Police Department." The ambassador services program also intended to install security cameras and security lighting throughout the district. Sanitation, beautification/capital improvements included sidewalk sweeping, sidewalk pressure washing, illegal dumping pickup, graffiti removal, and "clean up patrols," along with landscape watering, tree trimming, and streetscape improvements as well as capital improvement beautification projects. According to the Management District Plan, "[e]xamples of streetscape improvements include street tree 'twinkle' lighting, holiday decorations, street furniture, decorative banners, and utility services." Finally, "Marketing and Special Events" included "website development and updates, newsletter publication, branding and marketing program development, advertising, public relations activities[,] and special events," as well as "business attraction, recruitment[,] and retention." "Special events include concerts, festivals, and Los Angeles Fleet Week events."

## B. The DCBID

According to the Management District Plan Summary drafted to support the DCBID's 2017 renewal, the DCBID "was created to include the commercial core of Downtown Los Angeles." "The property uses within [DCBID's] boundaries are a mix of office, retail, cultural, religious, parking, publicly-owned transit, publicly-owned library, publicly-owned parks, publicly-

7

owned office building, residential[,] and mixed-use residential."
The summary noted that the DCBID would contain two different
"benefit zones," to be assessed at different rates based on "a
different level of services and a different level of benefit" provided
to each zone.  Specifically, the summary reported that "Zone Two
will receive a differing level of benefit in the form of a higher
frequency of cleaning and graffiti abatement services than Zone
One. . . .  Zone One properties, because of less pedestrian activity,
require less cleaning services in order to maintain a level of
cleanliness consistent with Zone Two and provide a consistent
level of cleanliness throughout the [DCBID]."

The materials supporting the 2017 DCBID renewal
identified "improvements and activities" that the DCBID would
provide that fell within three identified categories:  safety and
cleanliness, marketing and economic development, and BID
management.  "CLEAN and SAFE" included, as the title implies,
activities to promote safety and cleanliness.  The "Safe Team
Program" was to "provide security services for the individual
assessed parcels located within the [DCBID] in the form of
patrolling bicycle personnel, nighttime vehicle patrol[,] and
downtown ambassadors."  The engineer's report stated that the
"[t]he special benefit to assessed parcels from these services is
increased commercial activity which directly relates to increases
in lease rates, residential serving businesses[,] and customer
usage."  Safe services were to be provided to both benefit zones at
the same level.

The report explained that the "Clean Program" began at
the DCBID's inception in 1998.  "Basic cleaning services, such as
trash pickup and removal from the District, landscape service,
equipment expense and management are delivered to" both

8

benefit zones.  According to the engineer's report, "Zone One will receive approximately 200 additional hours [annually] above the baseline level of sidewalk sweeping, sidewalk cleaning[,] and graffiti removal.  Zone Two will receive approximately 625 additional hours [annually] above the baseline level of sidewalk sweeping, sidewalk cleaning[,] and graffiti removal."  Sidewalk cleaning was to include sweeping and pressure washing.  Trash collection was to include both trash collection and dispatch of personnel to "collect stolen shopping carts and large bulky items illegally dumped in" the DCBID.  The DCBID undertook to remove graffiti by "painting, using solvent[,] and pressure washing," and made a goal of "remov[ing] all tags within 24 hours on weekdays."  The Clean Program also included landscape improvement and street tree trimming.

The engineer's report also identified economic development and marketing programs and projects designed to "communicate the changes that are taking place in the [DCBID] and to enhance the positive perception of the [DCBID]."  "The special benefit to District assessed parcels from these services," the engineer's report said, "is increased commercial activity which directly relates to increases in lease rates and enhanced commerce."

## C. The BIDs Assessment Methodology

The BIDs each employed separate methodologies to calculate special benefits and assessments attributable to individual parcels.  For DCBID, the methodology was the result of a four-step process.  First, the BID undertook to "[d]efin[e] the proposed activities."  Second, the BID "[d]etermine[d] which parcels specially benefit[ted] from the proposed activities."  Third, the BID "[d]etermin[ed] the amount of special benefit each parcel receive[d]."  And fourth, the BID "[d]etermin[ed] the proportional

9

special benefit a parcel receives in relation to the amount of special benefit all other parcels in the PBID receive[d]."

From that four-step process, DCBID arrived at what it called a Special Benefit Factor, which the engineer's report explained in great detail. The report ultimately described the factor as a function of what it termed "assessable square footage," which the reports explained was generally "the total of gross building square footage and/or when applicable, land square footage, plus applicable, assessable parking square footage for each parcel."

Finally, the DCBID engineer's report contained a detailed benefit analysis. The analysis purported to restate the special benefits that had already been set forth in greater detail under headings related to each of the BIDs' programs and activities. The analysis then purported to identify with specificity any general benefit to parcels both inside and outside of each BID and general benefit to the general public.

For SPBID, the methodology consisted of seven steps. First, the engineer's report selected what it termed a "basic benefit unit." Because SPBID services were "property related services," "the benefit unit [could be] measured in linear feet of street frontage or parcel size in square feet or building size in square feet or any combination of these factors. Factor quantities for each parcel are then measured or otherwise ascertained." And based on the factor quantity, the engineer's report could then assign an appropriate number of benefit units to each parcel. At this stage of the process, the engineer's report stated, "[s]pecial circumstances such as unique geography, land uses, development constraints[,] etc.[,] are carefully reviewed relative to specific programs and improvements to be funded by the PBID in order to

10

determine any levels of different benefit that may apply on a parcel-by-parcel or categorical basis."

After identifying the basic benefit unit, the engineer quantified the total basic benefit units by identifying the specially benefited parcels and their assessable benefit units. That number derived from step two was then used in step three to calculate benefit units for each property.

Step four of the SPBID process was to determine the assessment formula. The formula was identical for zone 1 and zone 2 assessments, but was different for zone 3 assessments. Within each zone, the assessment formula was different for commercial parcels, residential parcels, and parcels the report termed "land area." In step five, the SPBID estimated the total district costs for all of the proposed programs and services. Step six was to separate general benefits from special benefits and related costs. Step seven was to calculate what the report termed the "basic unit cost." And step eight was to apply the assessment formula based on the unit costs to the parcels in the district.

### D. This Litigation

"Petitioners . . . initiated two actions . . . with Mesa challenging the San Pedro BID and Hill and Olive attacking the Downtown Center BID. The verified pleadings contain similar allegations, with each averring that the BID in question violates Proposition 218. Boiled down, petitioners assert that the assessments imposed for the BIDs contravene the initiative because they are premised on an incorrect and inadequately supported understanding of the 'special' versus 'general' benefits that will accrue from each BID's activities—treating as 'special' what petitioners contend are in fact 'general' benefits . . .—and because the assessments imposed on petitioners exceed the

11

reasonable cost of the proportional special benefits conferred on their parcels.  Petitioners seek various forms of relief that would remove any obligation that they pay assessments for the BIDs." (*Hill*, *supra*, 12 Cal.5th at p. 471, fn. omitted.)

The trial court denied both petitions in full on the merits and entered judgments for the City of Los Angeles and the BIDs. The petitioners filed timely notices of appeal.

On appeal, we concluded by opinion issued June 29, 2020, that the petitioners were obligated to exhaust administrative remedies before initiating a challenge to the establishment of the BIDs in a judicial forum.  The Supreme Court granted review and reversed, concluding that "[p]etitioners did not have to articulate their objections to the BID assessment schemes at the public hearings before the City Council to subsequently present their arguments in these proceedings." (*Hill*, *supra*, 12 Cal.5th at pp. 491-492.)  The Supreme Court then remanded the matter for further proceedings consistent with its decision.  (*Id.* at p. 492.)

Consistent with the Supreme Court's remittitur, we vacated our earlier opinion.  On remand, the parties submitted supplemental briefs pursuant to California Rules of Court, rule 8.200(b).

## DISCUSSION
### A. Legal Principles
#### 1. Proposition 218

Proposition 218, " 'approved by voters in 1996, is one of a series of voter initiatives restricting the ability of state and local governments to impose taxes and fees.' " (*Hill*, *supra*, 12 Cal.5th at p. 473.)  The proposition, " 'known as the "Right to Vote on Taxes Act," . . . added articles XIII C and XIII D to the California Constitution.  [Citation.]  Article XIII C concerns voter approval

for many types of local taxes other than property taxes. Article XIII D addresses property-based taxes and fees. [¶] Article XIII D allows only four types of local property taxes: (1) an ad valorem tax, (2) a special tax, (3) an assessment, and (4) a property-related fee. (Art. XIII D, § 3, subd. (a).)' " (*Ibid.*)

"Section 4 of Proposition 218 (art. XIII D, § 4) is specifically concerned with assessments. Regarding these levies, Proposition 218 'was designed to: constrain local governments' ability to impose assessments; place extensive requirements on local governments charging assessments; shift the burden of demonstrating assessments' legality to local government; make it easier for taxpayers to win lawsuits; and limit the methods by which local governments exact revenue from taxpayers without their consent.' " (*Hill*, *supra*, 12 Cal.5th at p. 473, quoting *Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 448 (*SVTA*).)

"Proposition 218 has both substantive and procedural ramifications for assessments. Substantively, it 'restricts government's ability to impose assessments in several important ways. First, it tightens the definition of the two key findings necessary to support an assessment: special benefit and proportionality. An assessment can be imposed *only* for a "special benefit" conferred on a particular property. (Art. XIII D, §§ 2, subd. (b), 4, subd. (a).) A special benefit is "a particular and distinct benefit over and above general benefits conferred on real property located in the district or to the public at large." (Art. XIII D, § 2, subd. (i).) The definition specifically provides that "[g]eneral enhancement of property value does not constitute 'special benefit.' " (*Ibid.*) Further, an assessment on any given parcel must be in proportion to the special benefit conferred on

13

that parcel: "No assessment shall be imposed on any parcel which exceeds the reasonable cost of the proportional special benefit conferred on that parcel." (Art. XIII D, § 4, subd. (a).) . . . Because only special benefits are assessable, and public improvements often provide both general benefits to the community and special benefits to a particular property, the assessing agency must first "separate the general benefits from the special benefits conferred on a parcel" and impose the assessment only for the special benefits. [Citation.]' [Citation.]

"Procedurally, all assessments captured by Proposition 218 'shall be supported by a detailed engineer's report prepared by a registered,' state-certified professional engineer. (Art. XIII D, § 4, subd. (b).)" (*Hill*, *supra*, 12 Cal.5th at p. 474.)

" 'To make it more difficult for an assessment to be validated in a court proceeding' [citation], [Proposition 218] provides that '[i]n any legal action contesting the validity of any assessment, the burden shall be on the agency to demonstrate that the property or properties in question receive a special benefit over and above the benefits conferred on the public at large and that the amount of any contested assessment is proportional to, and no greater than, the benefits conferred on the property or properties in question.' (Art. XIII D, § 4, subd. (f).)" (*Hill*, *supra*, 12 Cal.5th at p. 475.)

**2. The PBID Law**

"The PBID Law provides a framework for the establishment and operation of BIDs in this state. The statute reflects and furthers the Legislature's view that '[i]t is of particular local benefit to allow business districts to fund business related improvements, maintenance, and activities through the levy of assessments upon the businesses or real

14

property that receive benefits from those improvements.' (Sts. & Hy. Code, § 36601, subd. (c).) The 'activities' contemplated by the PBID Law include, but are not limited to, the '[p]romotion of public events' and tourism within a district, '[f]urnishing of music in any public place,' '[m]arketing and economic development,' and '[p]roviding security, sanitation, graffiti removal, street and sidewalk cleaning, and other municipal services supplemental to those normally provided by the municipality.' (Sts. & Hy. Code, § 36606, subds. (a), (b), (d), (e).) The 'improvements' referenced by the law include, but again are not limited to, parking facilities, benches and kiosks, trash receptacles and public restrooms, lighting and heating facilities, decorations, parks, fountains, and planting areas. (Sts. & Hy. Code, § 36610.)" (*Hill*, *supra*, 12 Cal.5th at pp. 475-476.)

Relevant to these appeals, the Legislature amended the PBID Law effective January 1, 2015 to include the following: "Activities undertaken for the purpose of conferring special benefits upon property to be assessed inherently produce incidental or collateral effects that benefit property or persons not assessed. Therefore, for special benefits to exist as a separate and distinct category from general benefits, the incidental or collateral effects of those special benefits are inherently part of those special benefits. The mere fact that special benefits produce incidental or collateral effects that benefit property or persons not assessed does not convert any portion of those special benefits or their incidental or collateral effects into general benefits." (Sts. & Hy. Code, § 36601, subd. (h)(2), added by Assem. Bill. No. 2618 (2013-2014 Reg. Sess.) § 1.) The Bill also added section 36615.5 to the Streets & Highways Code, which states in full: " 'Special benefit' means, for purposes of a

15

property-based district, a particular and distinct benefit over and above general benefits conferred on real property located in a district or to the public at large.  Special benefit includes incidental or collateral effects that arise from the improvements, maintenance, or activities of property-based districts even if those incidental or collateral effects benefit property or persons not assessed.  Special benefit excludes general enhancement of property value." (Sts. & Hy. Code, § 36615.5, added by Assem. Bill. No. 2618 (2013-2014 Reg. Sess.) § 14.)[2]

### 3. Standards of Review

We "exercise our independent judgment in reviewing whether assessments that local agencies impose violate" Proposition 218. (*SVTA, supra*, 44 Cal.4th at p. 450.)  Likewise, on a facial challenge to the validity of a statute, "[w]e use our independent judgment to decide whether the challenged law is

---

[2] In July 2022, the Legislature passed and the Governor signed Assembly Bill No. 2890, which amended Streets and Highways Code sections 36615.5 and 36622, operative January 1, 2023.  (Stats. 2022, ch. 129, §§ 1, 2.)  Neither party contends that the amendments have any retroactive effect.  And the legislation contains no language that would indicate retroactive application.  Therefore, we have not reviewed this matter in the context of Assembly Bill No. 2890.  (See *Phillips v. St. Mary Regional Medical Center* (2002) 96 Cal.App.4th 218, 229 ["Generally, statutes do not apply retroactively unless the Legislature clearly indicated otherwise"].)  Nevertheless, we note that the legislative history for Assembly Bill No. 2890 generally indicates that the purpose of the bill was to modify and clarify the information that must be in a BID management district plan and to "codify" *Dahms, supra*, 174 Cal.App.4th 708, and other recent cases. (E.g., Assem. Com. on Local Gov., Rep. on Assem. Bill No. 2890, (2021-2022 Reg. Sess.) as amended Apr. 19, 2022, pp. 2-3.)

16

constitutional." (*Perez v. County of Monterey* (2019) 32 Cal.App.5th 257, 261.)

We note that "although we use a de novo standard of review here, we do not transform into a trial court. As a Court of Appeal, even in exercising our independent judgment, we do not find it sufficient for an appellant merely to claim the respondent should not have been successful at trial and then the burden shifts to the respondent to prove its case in its entirety again. Instead, the appellant must frame the issues for us, show us where the superior court erred, and provide us with the proper citations to the record and case law." (*Morgan v. Imperial Irrigation Dist.* (2014) 223 Cal.App.4th 892, 913.)

## B. The Amendments to the PBID Law are not Facially Unconstitutional

Petitioners broadly contend that the 2014 amendments (effective January 1, 2015) to the PBID Law are an unconstitutional end-run around the Supreme Court's opinion in *SVTA, supra,* 44 Cal.4th 431. They couch their constitutional challenge not on the particular application of the statute, but rather as a facial challenge to the validity of the 2014 statutory amendments that include collateral effects of a special benefit in the definition of a special benefit.

" 'A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual.' [Citation.] To succeed on a facial challenge, a [party] must show that the law in question could *never* be applied in a constitutional manner; it is not enough to show that the law would be unconstitutional under some circumstances. [Citation.] We use our independent judgment to decide whether the

17

challenged law is constitutional." (*Perez v. County of Monterey*, *supra*, 32 Cal.App.5th at p. 261.)

The petitioners' argument does not identify a flaw in the text of the 2014 amendments based on any stated contradiction with the text of Proposition 218. Rather, the petitioners contend that the Supreme Court's opinion in *SVTA*—describing the benefits at issue in that case as general benefits—"held" that "economic enhancements, quality-of-life benefits, and derivative, indirect benefits *do not* constitute special benefits."

*SVTA* dealt with the Santa Clara Open-Space Authority, which included "all Santa Clara County lands except those already within the boundaries" of another open-space district. (*SVTA*, *supra*, 44 Cal.4th at pp. 437-438.) "The proposed assessment district included approximately 314,000 parcels and over 800 square miles containing over 1,000,000 people." (*Id.* at p. 439.) The purpose of the proposed assessment was to fund the purchase and maintenance "of open space lands for recreation, conservation, watersheds, easements, and similar purposes." (*Ibid.*) The engineer's report supporting the establishment of the district "identified no particular parcels to be acquired and no particular areas [within the 800 square mile district] to be prioritized." (*Ibid.*)

The engineer's report in *SVTA* listed seven "special benefits" that the assessment would confer on "*all* residents and property owners in the district: (1) enhanced recreational activities and expanded access to recreational areas; (2) protection of views, scenery, and other resources; (3) increased economic activity; (4) expanded employment opportunity; (5) reduced costs of law enforcement, health care, fire prevention, and natural disaster response; (6) enhanced quality of life and

18

desirability of the area; and (7) improved water quality, pollution reduction, and flood prevention." (*SVTA*, *supra*, 44 Cal.4th at p. 453.) The Court focused its analysis through the lens of Proposition 218's plain language, which it said required that "a special benefit must affect the assessed property in a way that is particular and distinct from its effect on other parcels and that real property in general and the public at large do not share." (*Id.* at p. 452.) The Court then methodically examined each of the seven special benefits in the context of both the engineer's report and the context of the composition of the district, and concluded that each of the seven were—*in the context of the district at issue*—general rather than special benefits. "All the listed benefits," the Court said, "are general benefits *in this case*, shared by everyone—all 1.2 million people—living within the district." (*Id.* at p. 454, italics added.)

The benefits at issue in *SVTA* are the seven benefits that the engineer's report in that matter listed. The Supreme Court was not focused on and did not make any declaration regarding collateral effects of special benefits that could themselves be classified as general benefits.

Moreover, the Court's opinion in *SVTA* appears to be based more on the relationship between the assessed parcels and each particular benefit than to a categorical determination about whether a particular benefit could ever pass constitutional muster under Proposition 218. The Court pointed out that "[i]n a well-drawn district—limited to only parcels receiving special benefits from the improvement—every parcel within that district receives a *shared* special benefit." (*SVTA*, *supra*, 44 Cal.4th at p. 452, fn. 8, italics added.) The Court said that it did "not believe that the voters intended to invalidate an assessment district that

19

is narrowly drawn to include only properties directly benefitting from an improvement. . . . Thus, if an assessment district is narrowly drawn, the fact that a benefit is conferred throughout the district does not make it general rather than special. In that circumstance, the characterization of a benefit may depend on whether the parcel receives a direct advantage from the improvement (e.g., proximity to a park) or receives an indirect, derivative advantage resulting from the overall public benefits of the improvement (e.g., general enhancement of the district's property values)." (*Ibid.*)

The Court also found it significant that the assessment district assumed that benefits would affect people and property throughout the county-wide district equally, but drew no link based on proximity to any particular open space that was to be acquired or maintained. (*SVTA*, *supra*, 44 Cal.4th at pp. 454, 455-456.) The report "[did] not even attempt to measure the benefits that accrue to particular parcels." (*Ibid.*)

It bears repeating that *SVTA* did not make any statement about benefits not articulated in the engineer's report in that case; it made no determination about benefits that were a function of *other*, *enumerated* benefits. That is what is at issue here. Consequently, we disagree with the petitioners' argument that the Supreme Court's opinion in *SVTA* renders unconstitutional the 2014 amendments to the PBID Law.

We also note that the petitioners' argument would leave Proposition 218 with *no* discernible application. Were we to accept petitioners' assertions, any properly categorized special benefit that incidentally created any sort of benefit for any other property or person—that generally raised a district's property values, for example—would violate Proposition 218 because it

20

would create what the court in *Beutz v. County of Riverside* (2010) 184 Cal.App.4th 1516, 1537 (*Beutz*), called a "collateral general benefit." (Also *Broad Beach Geologic Hazard Abatement Dist. v. 31506 Victoria Point LLC* (2022) 81 Cal.App.5th 1068, 1086 (*Broad Beach*).)

In *Town of Tiburon v. Bonander* (2009) 180 Cal.App.4th 1057 (*Tiburon*), the court described the general concept that the 2014 amendments appear to codify. "[T]he prohibition against basing assessments on *general* property value enhancements," the court said, "does not mean any benefit that enhances property values is a general benefit. Nearly every assessment that confers a particular and distinct advantage on a specific parcel will also enhance the overall value of that property in some respect. *Such an effect does not transform a special benefit into a general benefit.* An increase in property value attributable to a project that provides a direct advantage to a particular property— instead of an indirect or derivative benefit—is a specific rather than a general enhancement in the property value." (*Id.* at p. 1079, italics added.)

We disagree with the petitioners' contentions and on that basis reject their constitutional challenge to the PBID Law's 2014 amendments.

## C. The DCBID and SPBID Assessments

"[U]nder the plain language of [Proposition 218], a special benefit must affect the assessed property in a way that is particular and distinct from its effect on other parcels and that real property in general and the public at large do not share." (*SVTA*, *supra*, 44 Cal.4th at p. 452.)

21

### 1. The Engineers' Reports Properly Characterize Benefits as Special Benefits

The petitioners' second set of contentions center on whether the benefits identified in the engineers' reports are special benefits as Proposition 218 uses that term.

Hill and Olive contend that the special benefits identified in the engineer's report for the DCBID for the Safe Team Program Services and the Clean Program are actually *general* benefits, and not *special* benefits because the stated benefits essentially amount to general enhancements of property value. Mesa makes the same argument with regard to the SPBID's Visitor Program, Ambassador Security Services, and Sanitation and Beautification improvement categories.

The DCBID's Safe Team Program is described in the engineer's report as specifically providing security services for assessed parcels "in the form of patrolling bicycle personnel, nighttime vehicle patrol and downtown ambassadors." The program's objective is to "prevent, deter[,] and report illegal activities taking place on the streets, sidewalks, storefronts, parking lots[,] and alleys." The particular illegal activities the program is to target are "public urination, indecent exposure, trespassing, drinking in public, prostitution, illegal panhandling, illegal vending, and illegal dumping."

The DCBID's Clean Program was intended to provide sidewalk cleaning, including "[u]niformed, radio equipped personnel [who] sweep litter, debris[,] and refuse from sidewalks and gutters," pressure washing of sidewalks, collecting trash from sidewalk trash receptacles as needed, collecting stolen shopping carts and illegally dumped bulky items, graffiti removal, including a stated effort "to remove all tags within 24

hours on weekdays," and landscape improvement and tree trimming.

The engineer's report lists benefits for both programs to "[r]esidential and mixed-use residential parcels" as "an enhanced sense of safety, cleanliness[,] and a positive user experience[,] which in turn enhances the business climate and improves the business offering and attracts new residents, businesses and District investment." Under a separate special benefits analysis, the report lists a special benefit as "the likelihood of increased lease rates and tenant occupancy due to the increase of commercial activity and an increase in customers that follow from having a safer environment." *"In addition,"* the report states, *"each specially benefitted parcel benefits from:  increased security patrol, removing graffiti from their buildings, connecting the homeless to available resources, reducing the number of trips and falls by repairing the grout in the sidewalks in front of their parcel, picking up trash that pedestrians leave behind, and power washing their sidewalks."* (Italics added.)

The SPBID describes its Visitor Program as "includ[ing] shuttle services with multiple shuttle stops, refurbishment and/or replacement of shuttles, visitor kiosk[s] with maps and brochures, wayfinding signage, monument signage[,] and high technology advances to automate and enhance the various Visitor Program elements.  The Visitor Program is designed to attract visitors and tourists to, and for the special benefit of, individually assessed parcels in both the Historic Downtown and the Waterfront areas of the" SPBID.  The engineer's report notes that the Visitor Program attracts tenants and investors for residential parcels, and "is designed to increase residential occupancies, residential rental income[,] and return on investment[ ] for

23

each . . . assessed parcel[ ]." The report also states that the program "is designed to improve livability for each of the[ ] assessed residential parcels by," among other things, "transporting *residents* and visitors to other assessed parcels within the" SPBID. (Italics added.)

SPBID's "Ambassador/Security Services uses uniformed ambassadors that provide security services to each . . . assessed parcel . . . by reporting crime to LAPD and the Port Police Department." According to the engineer's report, "[t]he presence helps prevent, deter, and report illegal activities in the" SPBID. The report states that these services will benefit residential parcels by "improv[ing] security for each of the[ ] assessed parcels by reducing and deterring crime . . . ."

The SPBID "Sanitation Services include sidewalk sweeping, sidewalk pressure washing, illegal dumping pickup, graffiti removal and clean up patrols." "Beautification/Capital Improvements includes landscape watering, tree trimming, streetscape improvements and capital improvement projects." The program specifically includes palm tree trimming and weekly landscape watering, holiday decorations and lighting, street furniture, and decorative banners. Besides "attracting more tenants and investors" for residential parcels, the report notes that these projects will also "improve the physical appearance of . . . assessed residential parcels by providing physical amenities adjacent to and for the special benefit of each of the[ ] assessed parcels."

In addition to the program-specific benefit descriptions, the SPBID engineer's report contains statements of both BID-wide benefits broken down by property type, and program-by-program benefits, again detailed by property type. The broader statement

24

of benefits claims that the district's services "are designed to improve the cleanliness, security, marketability[,] and livability of each of the[ ] assessed parcels and residential units on them. For the[ ] assessed parcels, [SPBID] programs, services[,] and improvements are designed to improve security and aesthetic appeal . . . by reducing crime, litter[,] and debris and professionally marketing the availability of residential units within the [SPBID] and the array of goods, services[,] and activities available within the [SPBID] . . . ."

Each of the programs identified by the petitioners constitutes a special benefit as Proposition 218, the PBID Law, and the Supreme Court's opinion in *SVAT* guide our understanding of that term. As an initial matter, the DCBID and the SPBID, as well as the respective benefit zones in each BID, appear from the engineers' reports to have been crafted to achieve the most impact specifically for assessed properties with the different levels of benefits provided to each assessed parcel. Additionally, the fact that the programs are geared specifically to provide services both *to* and *for the direct benefit of* assessed properties appears to be clear even aside from the benefits identified in the engineers' reports. Obvious security patrol aimed at the properties within the DCBID, for example, makes those properties safer places to live and work. Graffiti cleaning, sidewalk scrubbing, and increased trash removal make properties cleaner and more attractive, and encourage people both to move to and stay in homes that they might have otherwise left for cleaner, safer areas.

Like each of the cleaning, beautification, and security initiatives, the Visitor Program provides benefits directly to assessed properties. Two obvious benefits of the Visitor

25

Program's shuttle and information services are reduced traffic and parking problems at and in front of assessed parcels and shuttle services in addition to other public transportation options.

Based on our independent review, we conclude that the challenged services and the benefits identified in the engineers' reports are properly characterized as special benefits.

## 2. The Engineers' Reports Adequately Describe Benefits from Marketing Initiatives

Petitioners also challenge both BIDs marketing and events plans as general benefits rather than special.

The SPBID engineers' report identifies activities as "website development and updates, newsletter publication, branding and marketing program development, advertising, public relations activities[,] and special events. The DCBID's economic development and marketing plan identified 27 different activities under two primary categories as "some of the programs and projects" under marketing and business recruitment and retention headings. Specific programs included newsletters, information kiosks, downtown center maps, communications with property owners, special events, banners, advertising, trade show marketing, and several programs specifically designed to recruit new businesses to the DCBID.

Specific to residential parcels, the DCBID engineer's report identified "increased awareness of [DCBID] amenities such as retail and transit options . . . ." Moreover, to the extent the DCBID is producing special events and bringing new businesses to the DCBID, it is creating access to those new businesses. The SPBID engineer's report noted that these functions are "designed to improve the livability of each of the[ ] assessed residential parcels. In addition, the report notes that the marketing function

26

for the SPBID will "professionally market[ ] the availability of residential units within the [SPBID] and the array of goods, services[,] and activities available within the District . . . ."

Finally, we note that the trial court relied heavily on this Division's opinion in *Dahms*, *supra*, 174 Cal.App.4th 708 in drawing the same conclusions that we have reached regarding the assessed benefits at issue here. In *Dahms*, we considered benefits that the BID management district plan had identified as special benefits: "(1) security, (2) streetscape maintenance (e.g., street sweeping, gutter cleaning, graffiti removal), and (3) marketing, promotion, and special events." (*Id.* at p. 713.) We concluded that those services were properly characterized as special benefits: "They are all services over and above those already provided by the City within the boundaries of the [BID]. And they are particular and distinct benefits to be provided only to the properties within the [BID], not to the public at large— they 'affect the assessed property in a way that is particular and distinct from [their] effect on other parcels and that real property in general and the public at large do not share.' [Citation.] The services provided by the [BID] are therefore special benefits . . . ." (*Id.* at p. 722.)

The assessed benefits in *Dahms* are strikingly similar to the assessed benefits at issue here. The petitioners' arguments here have not given us any reason to depart from those conclusions.

## 3. Administration and Management Services for Special Benefits are Expressly Constitutionally Permitted

Without citing any authority to support their arguments, the petitioners contend that the BIDs were required in the

27

engineer's report to provide a "benefit character analysis" for management and administration services that were included in the assessments for special benefits.

The plain language of Proposition 218 undermines the petitioners' argument. California Constitution, article XIII D, section 4, subdivision (a) provides, in pertinent part, that "[t]he proportionate special benefit derived by each identified parcel shall be determined in relationship to the entirety of the capital cost of a public improvement, *the maintenance and operation expenses of a public improvement, or the cost of the property related service being provided.*" (Italics added.)

As we read the constitutional text, the administrative cost of providing a special benefit is not in and of itself a benefit for which the engineer's report must account, but is assessable as part of the maintenance and operation expenses necessary to provide the special benefit. (Cal. Const., art. XIII D, §§ 2, subd. (f), 3, subd. (a), par. (4), 4, subd. (a).)

### D. The Engineers' Reports Are Sufficient to Support the BIDs Assessments

The petitioners each raise three challenges specifically to the engineer's reports supporting the BIDs' renewals. First, petitioners contend that the engineers' reports fail to separate general from special benefits. Second, they contend that the assessment methodologies are flawed because they failed to consider the unique circumstances of the petitioners' properties as low-income housing. Finally, the petitioners contend that the reports are not based on "solid, credible evidence," and therefore are not legally sufficient to support the BIDs' renewals.

Petitioners contend that the engineers' reports did not *sufficiently* separate general from special benefits. Petitioners'

28

contention is based largely on the petitioners' argument that a general benefit *created by a special benefit* is itself a separate general benefit that must be delineated in the engineers' report. We do not revisit our conclusion—and the conclusion of the other courts that have considered the question—that "collateral general benefits," as the *Beutz* and *Broad Beach* courts called them, or the "effect[s]" of "assessment[s] that confer[] a particular and distinct advantage on a specific parcel," as the *Tiburon* court described them, do not transform otherwise properly characterized special benefits into general benefits or require further analysis or separate treatment by the assessing agency.

Because we have rejected that argument, our review of the engineers' reports reveals that general benefits and special benefits are separately accounted for in each BID's methodology.

For the SPBID, the engineer's report details at great length what the special benefit is of each program to the assessed properties. As noted earlier, the engineer's report separated special benefits into three zones, each to be assessed at a different level based on the level and frequency of services to be provided in each zone. The report then further analyzed how much each service would specifically support each type of property and applied a "benefit factor" for each property. The report concluded that the BID renewal was intended to provide 100 percent of its services to specially benefit assessed parcels inside the BID. Nevertheless, the report concluded that there would be some general benefit to the public at large and that there would be indirect general benefits to parcels adjacent to and outside of the BID boundaries. The report applied different benefit factors to the benefits to the general public and the benefits to the 143 parcels (including 123 residentially zoned

29

parcels) adjacent to the BID boundaries. After generating a detailed analysis separating general from special benefits, the engineer's report included, for the entire life of the SPBID renewal, a spreadsheet of costs separated by year and benefit zone and separated into general and special benefit costs.

Petitioners' contention that the engineers' reports failed to account for the unique characteristics of their property is equally unavailing.

Petitioners contend that the language of Proposition 218 requires a subjective measure of the value of a benefit provided based on how a particular parcel owner might avail themselves of particular special benefits. Article XIII D, section 4, subdivision (a), they quote, says "no assessment shall be imposed on any parcel which exceeds the reasonable cost of the proportional special benefit conferred <u>on that parcel</u>." (Emphasis in petitioners' briefs.)

The subdivision that petitioners quoted from delineates the *two* "key findings" required to support a special assessment under Proposition 218: "special benefit and proportionality." (*SVTA*, *supra*, 44 Cal.4th at p. 443.) By focusing on the words "on that parcel" to the exclusion of everything else in Proposition 218, the petitioners would make Proposition 218's proportionality requirement impossible to support in *any* context.

We have outlined the engineers' reports methodology above that the engineers' reports each accounted for variations in types of property, including property uses, differences in services provided to particular properties based on locations in different benefit zones, and came to individualized property assessments based on complex proportionality calculations that accounted for individual variations on a parcel-by-parcel basis. Petitioners

identify no authority, and we are aware of none, supporting the requirement implicit in petitioners' argument that an engineer's report must assess on a parcel-by-parcel basis special benefit based on the subjective perceived value a property owner places on any particular special benefit.

Both the plain language of Proposition 218 and the cases interpreting it directly contravene the petitioners' argument.

Under Proposition 218, a special assessment may not "exceed[ ] the *reasonable cost* of the proportional special benefit conferred on that parcel." (Cal. Const., art. XIII D, § 4, subd. (a), italics added.) The *Tiburon* court emphasized the distinction the petitioners' argument raises: "For the sake of clarity, it must be emphasized that an assessment *is not measured by the precise amount of special benefits enjoyed by the assessed property.* [Citation.] *Instead, an assessment reflects costs allocated* according to *relative* benefit received. *As a general matter, an assessment represents the entirety of the cost of the improvement or property-related service, less any amounts attributable to general benefits* (which may not be assessed), *allocated to individual properties in proportion to the relative special benefit conferred on the property.*" (*Tiburon, supra*, 180 Cal.App.4th at p. 1081.) "Thus, the 'reasonable cost of the proportional special benefit,' which an assessment may not exceed, simply reflects an assessed property's proportionate share of total assessable costs as measured by relative special benefits." (*Ibid*.)

More directly, the petitioners' contention regarding the special nature of their properties are not focused on the statutory criteria for measuring proportionality of a special benefit. As we recognized in *Dahms, supra*, 174 Cal.App.4th at p. 716, under article XIII D, section (4), subdivision (a), the "proportionate

special benefit derived by each identified parcel shall be determined *in relationship to the entirety of the capital cost* of a public improvement, *the maintenance and operation expenses* of a public improvement, *or the cost of the property related service* being provided.  No assessment [may] . . . exceed[ ] the *reasonable cost* of the proportional special benefit conferred on that parcel." (Italics added.)  The proportional special benefit to a particular parcel, then, is not measured by the property owner's subjective perception of how the improvement or service benefits the property, but rather is measured by the cost of the improvement or service on a proportional basis.  (See *SVTA*, *supra*, 44 Cal.4th at p. 443.)

Finally, relying on *Beutz*, *supra*, 184 Cal.App.4th 1516, petitioners contend that the engineers' reports are not based on "solid, credible evidence."  The petitioners' contentions are based in large part on the previously-rejected argument that the reports do not properly identify and account for general benefits that exist as collateral effects of special benefits.

Petitioners also contend, however, that because the reports rely on the engineers' "experience" to develop and apply proportionality analyses, that the reports rely on "a guess."  "This type of 'expert' analysis," the petitioners argue, "would certainly not be allowed in any courtroom—speculation is inadmissible and should be disregarded, and does not constitute 'solid, credible evidence.' "

Proposition 218 and the PBID Law each require "a detailed engineer's report prepared by a registered professional engineer certified by the State of California" to support assessments.  (Sts. & Hy. Code, § 36622, subd. (l); also Cal. Const., art. XIII D, § 4, subd. (b).)  In the context of the PBID Law, Streets and Highways

Code section 36622 defines—in great detail—what constitutes "support" for an assessment. The petitioners do not contend that the engineers' reports here have failed to include information required by the PBID Law or Proposition 218.

The petitioners' challenges to the sufficiency of the engineers' reports resemble evidentiary objections as though engineers' reports supporting assessments were subject to Evidence Code provisions regarding expert testimony, but provide no authority or argument that would support that argument or assist us to determine why the reports are insufficient. Indeed, our review of the reports indicates that they meet Proposition 218's requirements and that they are methodologically appropriate for purposes of calculating proportional special benefit. The engineers' reports appear to strictly comply with Proposition 218 and the PBID Law, and appear to contain each of the elements Streets and Highways Code section 36622 requires.

The petitioners rely heavily on the *Beutz* case to support their argument. *Beutz*, however, does not support the petitioners' argument because of the differences between both the nature of the benefits at issue in that case and the content of the engineer's report described in the *Beutz* opinion.

*Beutz* dealt with a "Landscape Maintenance District" containing "6,858 assessable parcels"—all single-family residences. (*Beutz*, *supra*, 184 Cal.App.4th at p. 1526.) Each of the properties was to be assessed a flat $28 for the first fiscal year, and the purpose of the assessment was to maintain landscaping in four public parks. (*Ibid.*) Similar to the open space authority at issue in *SVTA*, the *Beutz* engineer's report based its assessment entirely on the budget of "ongoing costs of

33

maintaining the parks' landscaping." (*Id.* at p. 1532.) The report made no distinction between assessments to properties based on properties' distance from the parks or any other measure by which landscaping the parks might specially benefit a property. (*Id.* at pp. 1532, 1534.)

The court faulted the analysis because, contrary to Proposition 218's requirements, the report did not "separat[e] the general from the special benefits of [the entire] public improvement project *and* estimat[e] the *quantity* of each in relation to the other . . . ." (*Beutz, supra*, 184 Cal.App.4th at p. 1532, original italics.) "Missing from the Report," the court explained, "is an analysis of the *quantity* or extent to which the general public may reasonably be expected to use or benefit from the parks in relation to the *quantity* or extent to which occupants of Wildomar residential properties, either in the aggregate or individually, may use or benefit from the parks." (*Id.* at p. 1533.) The court noted that based on the report it was "unable to infer . . . how often or to what extent persons who live inside and outside Wildomar may reasonably be expected to use the parks." (*Ibid.*) Even beyond that, the report lacked an analysis of even how or to what extent the benefits would extend to the assessed properties. (*Ibid.*)

In *Broad Beach*, the court addressed a district that was created to abate shoreline erosion on a mile-long stretch of beach that included 121 parcels by importing "hundreds of thousands of cubic yards of sand to restore the width of the beach and provide a protective barrier" for the 121 parcels. (*Broad Beach, supra*, 81 Cal.App.5th at p. 1079.) Although some parcels would receive *no* "sand nourishment," the management district plan "projected they would benefit from . . . migration of sand placed elsewhere

34

on the beach." (*Id.* at p. 1080.) Other properties were located behind a revetment, but "[w]hether properties would be protected by the revetment was not a factor in the [d]istrict's methodology." (*Ibid.*) And in spite of the beach being publicly accessible, the report "concluded the project would not provide substantial general benefits for purposes of Prop[osition] 218." (*Id.* at p. 1081.)

The metrics absent in *Beutz are* present in the engineering reports here. The engineers' reports at issue here specifically quantify both the special benefits and general benefits and their relation to the other. The reports quantify which services are expected to benefit the general public and to what degree. And the projects in *Beutz*—landscaping in four public parks assessed without regard to how benefits might accrue to any specific property in the district—and *Broad Beach*—a public beach again assessed without regard to how the sand nourishment project would affect any specific property in the district or members of the public who would indisputably directly benefit from the project—are discernibly different from the projects here. The general benefits in *Beutz* and *Broad Beach* are, by those courts' own account, distinctly different from the collateral general benefit generated by special benefits in *Dahms* and in this case.

Indeed, the *Broad Beach* court expressly distinguished the general benefits at issue in *Broad Beach* and *Beutz* from the benefits at issue in *Dahms*. "In *Dahms*," the *Broad Beach* court said, "a property and business improvement district imposed a special assessment to fund certain services, including security and streetscape maintenance, for properties in a city's downtown area. [Citation.] A property owner challenged the assessment on the ground that the special benefits to the downtown properties

35

also produced general benefits (in the form of increased safety for the general public, for example), but that the district failed to separate and quantify those general benefits.  [Citation.]"  (*Broad Beach, supra*, 81 Cal.App.5th at p. 1086.)  The *Broad Beach* court further explained:  "The [*Dahms*] court explained that the district's services 'themselves *constitute*[*d*] special benefits' provided direction to assessed parcels, and contrasted these circumstances with those in which putative special benefits 'were merely the alleged *effects* of . . . services directly funded by the assessments . . . .' "  (*Ibid.*)  The *Broad Beach* court noted that "*Dahms*'s holding as to collateral general benefits stemming from the special benefits to assessed properties has not been extended beyond that limited context."  (*Ibid.*)

We do not extend *Dahms*'s holding here, either.  As we have noted, the services at issue, and the special benefits those services conferred on the properties at issue, are virtually identical to the services and special benefits at issue in *Dahms*.

In its order regarding Hill's petition, the trial court explained that "[t]here is nothing in the record to undermine the engineer's opinion.  A methodology had to be employed to determine proportionality; it would be unconstitutional to equally divide the special services costs by the number of parcels within the district.  The methodology used by the engineer makes sense in that the size and general character of the property dictates the proportionate special benefit each parcel will receive."  We view that rationale as applicable to both of the engineers' reports.

Based on our independent review, the methodology employed by each engineer appears to ensure Proposition 218's requirements that "[n]o assessment shall be imposed on any parcel which exceeds the reasonable cost of the proportional

36

special benefit conferred on that parcel."  (Cal. Const., art. XIII D, § 4, subd. (a).)

Because the petitioners have not demonstrated that the assessments at issue are invalid, they have also not demonstrated that the assessments constitute a special tax.  (See *SVTA*, *supra*, 44 Cal.4th at p. 442.)

## DISPOSITION

The trial court's judgments are affirmed.  Respondents are awarded their costs on appeal.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.